### Pete Ochoa v. The State.

No. 5799.    Decided May 12, 1920.

1.—Murder—Accomplice—Evidence—Letters—Interpretation.

Where, upon trial of murder, as an accomplice, the State introduced a number of letters written to the State's witness, who was alleged to have acted as principal, in which appellant advised her to poison the deceased, according to the interpretation of said letters, held that the defendant

would not be responsible for her acts unless they reflected his intention and his meaning must be ascertained by the jury from the letters in the light of the surrounding circumstances, and her opinion that the language had a meaning other than its purport could not be used.

### 2.—Same—Rules Stated—Interpretation of Letters—Opinion of Witness.

It is a general rule of law that the opinion of a witness is not available to interpret the language written or spoken by another, and where the facts in the instant case do not come within the exception to this rule, they were inadmissible, and the testimony was simply the conclusion of the witness and constitutes reversible error. Following Dowell v. State, 68 Texas Crim. Rep., 482, and other cases.

### 3.—Same—Evidence—Letters—Name.

With reference to the testimony of the witness, touching the identity of the person called "Coy" in the letter of February 2nd, 1919, the trial court was warranted in its admission, for the reason that the witness says that in a previous conversation appellant had arranged to refer to his son as "Coy."

### 4.—Same—Practice on Appeal—Newly Discovered Evidence.

Where the judgment is reversed and the cause remanded the assignment touching newly discovered evidence need not be considered.

Appeal from the District Court of Bexar. Tried below before the Honorable W. S. Anderson.

Appeal from the conviction of murder. Penalty, life-time imprisonment in the penitentiary.

The opinion states the case.

*Graves & Houtchens* and *L. B. Camp*, for appellant.—On question of interpretation of letters: Martin v. State, 58 S. W. Rep., 112.

*Alvin M. Owsley*, Assistant Attorney General, for the State.—Cited Johnson v. State. 30 Texas Crim. Rep., 420. Rice v. State, 54 Texas Crim. Rep., 149.

MORROW, JUDGE.—Appellant is sentenced to the penitentiary for life upon conviction as an accomplice in the murder of Alfredo Ochoa. The deceased was the nineteen year old son of appellant, and died in the city of San Antonio from strychnine poison administered on the 22nd day of February, 1919. Francisca Crisantes, a young woman nineteen years of age, Mexican descent, born in Corpus Christi, Texas, was arrested the night on which the homicide occurred. She at first disclaimed the commission of the offense, but about a month later confessed it, implicating appellant, who, at the time of the death of his son, was in the city of Fort Worth, Texas, some three hundred miles distant from San Antonio.

The girl testified on behalf of the State, and the theory of the State as developed therefrom was that a year or eighteen months before

the homicide the appellant had delivered to the girl a bottle of whisky, telling her that it contained poison, and directing her to administer it to Aurelia Flores, in order that an insurance policy in force upon the life of Aurelia Flores, payable to her daughter and to the appellant, might be collected. The poison was not administered to Aurelia Flores, but, according to the witness, was placed in her trunk and there remained until she administered it to the deceased. Aurelia Flores was in bad health, however, and subsequently died from natural causes, and appellant had some controversy over the collection of the part of the insurance policy payable to him. In the year 1904 appellant and his wife—to which marriage deceased was born—were divorced. Appellant's wife subsequently married Carter. The deceaseo died at the home of his mother. Appellant and Francisca Crisantes met at Corpus Christi some three years before the homicide, and lived together as husband and wife at various places, including Corpus Christi, San Antonio, Waco and Fort Worth. The appellant and his son had been engaged in the military service, and appellant had spent parts of his time in Nashville, Tennessee. For some eight or nine months preceding the homicide the woman had resided with her brothers and sisters in San Antonio. She testified that in June, 1918, the appellant visited her, and then told her to give the poisoned whisky to the deceased, and that when he later visited her on November 26th, which was the last time they met before the homicide, he repeated the instructions. The life of deceased was insured in favor of his mother and the appellant, and the desire to obtain this insurance is suggested as the motive of appellant for killing his son. The evidence showed that the relations between appellant and his son were friendly; and he testified denying the various incriminating facts relied upon by the State.

In support of its theory, the State introduced a series of letters, which are set out below, which were written by the appellant to Francisca Crisantes, and she, over his objection on the trial, was permitted to testify to the interpretation of some parts of these letters, which, together with her testimony interpreting, follow:

"Fort Worth, Texas,<br>August 28, 1918.

Dear Fannie:

I suppose and am *nearly sure* that everything has been a *complete failure*. Because the best opportunities have been *passing by*. But in the Corpus matter I am doing well notwithstanding the fact that Aurelia made her will, but it is not valid in cases of fraternal policies. By all means we must have the *patience* and take things as they come. I hope to see you soon. Remembrances to Tony, Lupita and Concha. Tell Santa that Saturday I am going to send her a little money that she may buy them as she likes, her little shoes.

Yours,<br>Pete."

Witness testified that by the language "I suppose and am nearly sure that everything has been a complete failure" he meant that the time had passed and I had not poisoned the boy.

"Fort Worth, Texas,
August 20, 1918.

Tuesday, 5 P. M.
　　Miss Fannie Crisantes,
　　　　1104 North Mesquite St., San Antonio, Texas.
Dear Fannie:
Up to this moment I have not received any letter from you but I cannot help but write you, as this is the only way I have any rest. I hope that as soon as you receive this letter you will answer me immediately and you will give me much news. It always makes me very happy when I receive a letter from you. I would take to sending you money so that you can help Trino to pay the rent. I ask you, Hoeny, to please conduct yourself with him in the best manner possible so that we may not have any difficulty whatever while I can be at your side, which will be in a few days. I cannot pass the hours of God being away from you so long. Perhaps this does not bother you, but it does me. I thought I was leaving for San Antonio today but I just received orders to the contrary and I do not know what moment I will leave. Tell me how you have been getting along, and if Tony is working. I hope that you have received the letter I sent you from Nashville. If you have heard anything further with reference to Aurelia let me know, otherwise don't be afraid, everything is going along better than I expected. Tell me if you are anxious to be with me and to go to Nashville. And this: say nothing to the boys nor to Trino, you know what they are. Further, we can get good work for you and for Tony, with a good salary. I hope you will answer me this same day, Honey, and tell me anything you like, but 'be careful.' Receive lots of little bites and kisses.

　　　　　　　　　　　　　　　　　　Yours,
　　　　　　　　　　　　　　　　　　　　Pete."

Tear this letter."
She testified that by the term "be careful" he was referring to the poison.

　　　　　　　　　　　　　　(February 9, 1919)
"Dear Fannie:
I thank you very much that you have sent me the C19T1 (letter), for in this way you are proving to me perhaps a badly based impression that I have had, but *I still wait from you more.* With this letter you now *have the best opportunity.* I am going to leave everything in *your hands* so that you may do it in the shortest possible time, or as *quickly as possible,* in the manner in which you may think it more convenient. Honey, so that our difficulties may be terminated forever, *everything, everything depends on that. I am ready.* Now it *depends that you do your part.* With kisses, and embraces and many,

Tex.—21

many remembrances I terminate this letter waiting your reply immediately, and asking you to *hurry* the *matter*.

Yours,

Pete."

Witness said that by the term "I still wait for more. With this letter you have the best opportunity," he meant the best opportunity I had to give the poison to the boy; and by the language "I am going to leave everything in your hands so that you may do it in the shortest possible time, in the manner in which you may think is more convenient," he meant for me, in the manner that I thought best, to give the poison to Alfred Ochoa; and by the language "Honey so that our difficulties may terminate forever, everything depends on that," he meant that as soon as I would poison the boy he would receive the money, and everything would be over; that by the language "I am ready. Now it depends that you do your part," he meant that I was to do my part and poison the boy, and that was the part for me to do. By the language "With kisses and embraces and many remembrances, I terminate this letter awaiting your reply immediately, and asking you to hurry the matter," he meant for me to hurry and get through with the boy.

" Fort Worth, Texas,

February 2, 1919.

My dear Fannie:

I am writing this letter with pleasure and hope that you are much better. Tomorrow, Monday, at eleven A. M. I am going to send you by wire, without fail, $15 that you may buy shoes. Mama, I believe I understand your worry. As to me, on every side things have gone wrong. I have not been able to collect the policy, but I hope to arrange this soon. Do *everything everything* possible to arrange the matter with Coy, as in this way you will be able to live better, please as I am anxious to send for you once and for all.

Yours, kisses and remembrances,

Pete."

By the language "As to me on every side things have gone wrong. I have not been able to collect the policy, but I hope to arrange this soon," he was referring to the policy of Aurelia Flores; and in the language "Do everything everything possible to arrange the matter with Coy," he was referring to the poison. He told me he would put the name in "Coy" in case someone would see the letter they would not know who he was referring to; and by the words "Let me know is Coy in San Antonio, or where he is," he meant he wanted to know if Alfred Ochoa was here in San Antonio or not.

"Fort Worth, Texas,
August 19, 1918.

Miss Fannie Crisantes,

1104 North Mesquite Street, San Antonio, Texas.

Dear Fannie:

I have just returned from Nashville, and on superior orders I remained here for a few days. Later will go to San Antonio. *From Corpus Christi I have received no news.* What do you think is the matter? It is now *time* that something should be *settled, otherwise we are going wrong.* Answer me this same day. Be very careful with going out much. My regards for everybody. Yours, Pete.

"Answer me this very day, care of general delivery, Fort Worth, Texas. My remembrance to Fannie, Lupita, Concha, also to Trino and Antonia."

With reference to the testimony of the witness touching the identity of the person called "Coy" in the letter of February 2, 1919, we think the court was warranted in its admission for the reason that the witness says that in a previous conversation appellant had arranged to refer to his son as "Coy."

With reference to her testimony that in using the words "arrange the matter" in that letter appellant was referring to the poison, and with reference to her interpretation of the words and phrases quoted from the letters above, we find nothing in the record, and are aware of no principle of law, supporting their admission. The witness states no rule by which she was able to determine that the language in the letters meant other than the words and context would indicate. She states no agreement with the appellant that they should be given a different meaning. These letters are used by the State to establish the fact that the appellant advised and urged his paramour to murder his son.

If the witness believed that by these letters appellant was advising her to poison his son, he would not be responsible for her acts unless they reflected his intention. His meaning must be ascertained by the jury from the letters in the light of the surrounding circumstances. Her opinion that the language had a meaning other than its purport could not be used. It is the general rule of law that the opinion of a witness is not available to interpret the language written or spoken by another, and the facts before us come within no exception to this rule. Cyc. Vol. 17, p. 682-4. This testimony can be classed as none other than the opinion and conclusion of the witness upon a vital matter in the case, and should have been rejected. Cyc. Vol. 17, page 221; Dowell v. State, 58 Texas Crim. Rep., 482, 126 S. W. Rep., 871; Warren v. State, 9 Texas Crim. App., 619, 35 Amer. Reports, 715; Martin v. State, 42 Texas Crim. Rep., 144; State v. Racine Co., 134 S. W. Rep., 401; Ginnuth v. Blankenship, 28 S. W. Rep., 828; Purnull v. Gandy, 46 Texas, 191; Railway v. Sherer, 21 S. W. Rep., 134; Harper

v. State, 56 L. R. A., 379 note; Carter v. State, 59 Texas Crim. Rep., 77; Underhill on Crim. Evidence, Sec. 483.

There are no other matters requiring notice in the record, except the assignment touching newly discovered evidence. That will doubtless not appear on another trial.

The error in permitting the proof of the opinion of the witness as to the meaning of the language used in the letters mentioned was material, and requires a reversal of the judgment, which is ordered.

*Reversed and remanded.*